J-A18018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARTAZ JAYQUAN ARRINGTON | : | |
| | : | |
| Appellant | : | No. 777 WDA 2022 |

Appeal from the Judgment of Sentence Entered May 26, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0007790-2020

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED: OCTOBER 25, 2023**

Martaz Jayquan Arrington appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, following his conviction of interference with custody of children.[1]  After review, we affirm.

The trial court provided the following factual summary:

[O]n June 17, 2020[,] at 11:24 a.m., Allegheny County Children Youth & Families ([]CYF[]) caseworker Darlene White arrived at a residence located at 1108 West North Street in the Manchester area of Pittsburgh to execute an Emergency Protective Order [(EPO)] that was signed by the Honorable [] Paul Cozza on June 15, 2020.  This EPO directed the removal of two minor children from the home.  CYF had requested the EPO due to [Arrington's and Keaira Wallace's (Mother)] unaddressed mental health and drug and alcohol issues.  [Caseworker White] was accompanied on that date by the maternal grandmother and CSI caseworker Victoria Palermo.  After knocking on the door and not receiving a response, [] White, [] Palermo, and the maternal grandmother

_____

[1] 18 Pa.C.S.A. § 2904(a).

were given access to the residence by a representative of the Housing Authority.[2]

[] White proceeded to the second floor of the residence and observed [Mother] and [Arrington] in bed. [] White was familiar with Mother and [Arrington], as she had been working with the family for several months prior to June 17, 2020. [] White told Mother why they were there and provided her with copies of the [EPO]. Mother began to cry hysterically, and told [Arrington] why [] White was there. [] White proceeded to the third[-]floor bedroom and retrieved the older child, who was [seven] years old.

[] White returned to the second floor to retrieve the younger child, who was [] two years old. Mother then asked [Arrington] to retrieve their young[er] child from her bedroom. As [] White was picking up the young[er] child from her bed, [Arrington] came into the room, told her to "give him his MF-ing daughter," and grabbed the child from [] White's hands. [Arrington] then walked into the master bedroom. [] White left the residence with the old[er] child, and contacted 9-1-1 to obtain assistance retrieving the young[er] child. The police and SWAT arrived. After over an hour of negotiating, [] White obtained custody of the [younger] child. When the [younger] child was released, [Arrington] was no longer in the residence.

[Arrington] testified that he was awoken to find [] White, [] Palermo, and the maternal grandmother in the hallway outside of his bedroom. [Arrington] testified that he knows [] White as the CYF caseworker and had previous interactions with her. [Arrington] testified that after he observed [] White and maternal grandmother retrieve their old[er] child from the third floor, [he] assumed the children were being taken by CYF. At that time, Mother was crying and told [him] to "go get our baby," which he did. When he went into the young[er] child's bedroom, [] White was also in the room, and [Arrington] grabbed the child.

_____

[2] The Housing Authority representative was about to perform an unrelated inspection of the residence. *See* N.T. Non-Jury Trial, 2/28/22, at 13.

Trial Court Opinion, 11/3/22, at 3-4.[3]

The EPO states as follows:

**REASONABLE EFFORTS TO PREVENT REMOVAL FROM HOME**

[T]he [c]ourt hereby finds that to allow this child to remain in the home would be contrary to the child's welfare, and that Reasonable Efforts were made by the Allegheny County Office of Children, Youth and Families to prevent or eliminate the need for removal of this child from the home.

**SUFFICIENT EVIDENCE**

Sufficient evidence was presented to prove the child should be kept in shelter care and that remaining in the home of Keaira Wallace and Martaz J. Arrington . . . is not in the best interest of child.

**ORDER – THE VERBAL ORDER IS HEREBY CONFIRMED AND:**

The application for court order of protective custody by the County Children and Youth Services agency is hereby granted. []CYF Caseworker and/or any duly authorized law enforcement officer is authorized to investigate further the surroundings of the above-named child and to take the child into custody if the child is in imminent danger form his/her surroundings or has run away from his or her custodian. If the child is taken into custody, a shelter care hearing must be held on the next day that the court is available to hear shelter hearings.

The agency must exhaust all other options before the child is placed into foster care or congregate care.

The agency shall exhaust all efforts to place the child with sibling(s) unless joint placement with sibling(s) is contrary to the safety or well-being of the child or sibling(s).

---

[3] We note that the EPO in question appears to be part of a separate docket. However, only the EPO from that docket is contained in the certified record before us. Accordingly, we take judicial notice that there was a parallel docket from which the EPO originated and upon which Judge Cozza based his findings.

> If the child is taken into custody, the agency shall make every effort to place the child with relatives or persons known to the child in order to minimize trauma.
>
> * * *
>
> **FURTHER ORDERS**
>
> IT IS FURTHER ORDERED that: This authorization shall expire within seventy-two hours unless the child has been taken into custody in the meantime. Law enforcement officers have permission to break into the premises if required by the circumstances.
>
> Such disposition having been determined to be best suited to the protection and physical, mental[,] and moral welfare of the child.

Commonwealth Exhibit A, at 1-2 (Emergency Protective Order).

Arrington was ultimately apprehended and charged with, *inter alia*, the above-mentioned offense.[4] On February 28, 2022, Arrington proceeded to a non-jury trial, after which he was convicted of the above-mentioned offense and found not guilty of simple assault. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report. On May 26, 2022, the trial court sentenced Arrington to one year of probation and ordered Arrington to complete batterer's intervention and parenting classes.

Arrington filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He now raises the following claims for our review:

> [(1)] Whether the evidence was sufficient to convict [] Arrington of [i]nterference [w]ith [c]ustody of [c]hildren, where the

---

[4] Arrington was also charged with aggravated assault, which was later amended to simple assault.

- 4 -

Commonwealth failed to prove, beyond a reasonable doubt that . . . he was not privileged to act in the manner in which he did?

[(2)] Whether the evidence was sufficient to convict [] Arrington of [i]nterference [w]ith [c]ustody of [c]hildren, where the Commonwealth failed to disprove, beyond a reasonable doubt, the statutory defenses raised under [sections] 2904(b)(3) and [] 2904(b)(1)?

Brief for Appellant, at 5.[5]

When examining a challenge to the sufficiency of the evidence, we adhere to the following standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

---

[5] We have re-ordered Arrington's claims for ease of disposition.

All of Arrington's claims involve section 2904 of the Crimes Code, which provides, in relevant part, as follows:

**§ 2904. Interference with custody of children**

**(a) Offense defined.--**A person commits an offense if he knowingly or recklessly takes or entices any child under the age of 18 years from the custody of its parent, guardian or other lawful custodian, when he has no privilege to do so.

**(b) Defenses.--**It is a defense that:

(1) the actor believes that his action was necessary to preserve the child from danger to its welfare; or

* * *

(3) the actor is the child's parent or guardian or other lawful custodian and is not acting contrary to an order entered by a court of competent jurisdiction.

18 Pa.C.S.A. §§ 2904(a)-(b)(1), (b)(3).

In his first claim, Arrington argues that the Commonwealth failed to provide sufficient evidence to sustain his conviction of interference with custody of children. *See* Brief for Appellant, at 34-38. In particular, Arrington asserts that he was "privileged" to take the younger child from White and that the Commonwealth failed to prove that he was not so privileged. *Id.* at 35-37. Arrington contends that, as the child's biological father, he was privileged to act in opposition to White, who was merely a custodian to the child. *See id.* at 36-38.

Generally, to demonstrate a "taking" in the context of section 2904, the Commonwealth must show that the defendant accomplished said taking by a

physical act. **See Commonwealth v. Rodgers**, 599 A.2d 1329, 1330 (Pa. Super. 1991) ("A taking from custody connotes a substantial interference with parental control . . . an affirmative removal of the child is necessary.") (quotations omitted);[6] **see also Commonwealth v. Giese**, 928 A.2d 1080, 1083 (Pa. Super. 2007) (same). After the initial act of taking, the act of interference continues **only** if the individual continually maintains the child outside of the custody of the legal custodian. **See Commonwealth v. Stewart**, 544 A.2d 1384, 1388 (Pa. Super. 1988).

Instantly, the record reveals that Arrington knowingly and physically took the two-year-old child from White. **See** N.T. Non-Jury Trial, 2/28/22, at 15-16, 23-25, 27-28 (White testifying Arrington took two-year-old child from her). Pursuant to the EPO, White, as an agent of CYF, was a lawful custodian of the two-year-old child. **See** Commonwealth Exhibit A. Additionally, Arrington had no privilege to defy the EPO. While Arrington is the biological father of the younger child, it is beyond cavil that a court order authorized White to take custody of both children. **See** Commonwealth Exhibit A. Moreover, we observe that Arrington knew he was not supposed to be in the residence due to a prior court order. **See** N.T. Non-Jury Trial, 2/28/22, at 47-48 (Wallace testifying she told Arrington to leave because police were coming

---

[6] We note that while **Rodgers** uses the term "parental," it is used because the facts of that case dealt with interfering with the **parents**' custody of their children. **See id.** at 1329-31. The terminology in **Rodgers** does not preclude its application to guardians or other lawful custodians, as denoted in section 2904. **See** 18 Pa.C.S.A. § 2904(a).

- 7 -

and Arrington was not permitted to be there); *id.* at 66-67 (Arrington testifying, after he retrieved the two-year-old child, he jumped out of second-story window because police were coming and he was not permitted to be there). Accordingly, the Commonwealth provided sufficient evidence to sustain Arrington's conviction. *See Smith*, *supra*.

In his second claim, Arrington raises two sub-issues, which we address separately, that the Commonwealth failed to disprove the affirmative defenses found in subsections 2904(b)(3) and (b)(1), respectively. *See* Brief for Appellant, at 11-33. In his first sub-issue, Arrington argues that the Commonwealth failed to disprove his defense under section 2904(b)(3), where the EPO, by its plain language, did not authorize immediate removal of the children from the residence, but rather permitted immediate investigation and removal only if said investigation revealed imminent danger to the welfare of the children. *See id.* at 24-25. Additionally, Arrington asserts that he was not provided with notice of the order because White spoke directly to Mother and provided Mother with copies, but never told Arrington what was in the EPO and did not provide him with a copy. *See id.* Arrington posits that, because he was not provided with notice, he could not have been acting contrary to the order. *See id.* We disagree.

Arrington's arguments are belied by the record. White testified that her supervisor and another department in CYF conducted the required investigation. *See* N.T. Non-Jury Trial, 2/28/22, at 27-28 (White testifying she was not involved in investigation and was just present to take custody of

children); *id.* (White testifying her supervisor had conducted investigation and concluded children were in danger).

Additionally, Arrington's next contention, that White never provided notice of the order to him, is similarly belied by the record. Indeed, it is true that White did not provide a copy of the order to Arrington. *See* N.T. Non-Jury Trial, 2/28/22, at 27 (White testifying she did not provide a copy of EPO to Arrington); *id.* at 60 (Arrington testifying White did not give him copy of EPO). Nevertheless, Arrington was in the same room when White told Mother that they were taking custody of the children pursuant to the EPO. *See id.* at 13-14, 27-28 (White testifying: Arrington was in the bedroom under covers; White told Mother about EPO; Mother asked White "Why are you taking my children?"). Moreover, Arrington was familiar with White, as he had been present at previous interactions with her that involved the children, and Wallace testified that she told Arrington why White was present that day. *Id.* at 43-44, 50, 51-52 (Wallace testifying Arrington was in room; Wallace testifying she told Arrington why White was there; Wallace testifying Arrington was present at prior interactions with White and Arrington was familiar with White); *id.* at 60-61, 64-65 (Arrington testifying he knew White was from CYF and she was there to take custody of his children). Accordingly, Arrington's claim that he lacked notice is without merit.

In his second sub-issue, Arrington argues that the Commonwealth failed to disprove his affirmative defense pursuant to subsection 2904(b)(1). *See* Brief for Appellant, at 28-33. Arrington contends that section 2904(b)(1) does

not require him to have a reasonable belief, but that it is enough to have an unreasonable belief. **See id.** (citing **Commonwealth v. H.D.**, 247 A.3d 1062 (Pa. 2021)). Arrington asserts that White's unannounced arrival after being let in by the Housing Authority, while Arrington and Mother were sleeping, created an atmosphere where Arrington, reasonably or unreasonably, felt the need to protect his child. **See** Brief for Appellant, at 32-33. We disagree.

In addressing this claim, we are mindful that our Supreme Court, in interpreting subsection 2904(b)(1), held that a defendant does not need a reasonable belief to satisfy the defense. **See H.D.**, 247 A.3d at 1067-68. Indeed, the Court reasoned that because the legislature did not specify "reasonable" belief, a defendant charged with section 2904 may act on an "unreasonable" belief and still properly invoke the defense in subsection 2904(b)(1). **See id.**

Instantly, Arrington's contention that he acted either reasonably or unreasonably in an effort to protect his child is also belied by the record. As noted **supra**, Arrington knew that White was from CYF. **See** N.T. Non-Jury Trial, 2/28/22, at 60-61, 64-65. Additionally, Arrington purportedly only acted because Mother told him to "go get our baby." **See id.** at 45-46 (Wallace testifying she told Arrington to go get their two-year-old); **id.** at 61-62 (Arrington testifying he only acted in such a manner because Wallace told him to do so). Consequently, our review of the record reveals that Arrington did not have any belief, reasonable or unreasonable, that his child was in danger; rather, Arrington merely did as Mother instructed. **See id.**; **id.** at 61-63, 66-

68 (Arrington testifying he was "not thinking" and he "had no thought at that time.  It was like an order given and I just followed her orders.").  Accordingly, Arrington is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/25/2023